UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPORTVISION, INC. and SPORTSMEDIA
TECHNOLOGY CORPORATION,

                              Plaintiffs,

                - against -

MLB ADVANCED MEDIA, LP,

                              Defendant.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 3025 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiffs Sportvision, Inc. and SportsMEDIA Technology Corp. ("SMT") bring

this action against Defendant MLB Advanced Media, LP ("Advanced Media"), asserting claims

for patent infringement, misappropriation of trade secrets, and breach of contract.  (Am. Cmplt.

(Dkt. No. 26))  Plaintiffs' claims arise from the parties' abandoned joint venture to "capture,

collect, market and disseminate" pitch data from Major League Baseball ("MLB") games using

Plaintiffs' PITCHf/x technology.  (See id. ¶ 107)

        Defendant Advanced Media has moved to compel arbitration of Plaintiffs'

misappropriation of trade secrets and breach of contract claims, and moved to dismiss Plaintiff's

patent infringement claim.  (Def. Mot. (Dkt. No. 43))  For the reasons stated below, Defendant's

motions will be denied.

## BACKGROUND[1]

### I.     THE PARTIES

As alleged in the Amended Complaint, Sportvision creates "innovative graphic enhancements of sports objects and graphic visualizations of sports elements" (Am. Cmplt. (Dkt. No. 26) ¶ 3), and SMT develops "real-time on-screen graphics, tickers, clock-and-score, virtual insertions[,] and social media integration for live televised sport and entertainment events."  (Id. ¶ 50)  On October 4, 2016, SMT acquired all of Sportvision's outstanding stock.  (Id. ¶ 53)

Defendant Advanced Media is a limited partnership of MLB club owners, which manages and directs MLB's digital properties.  (Id. ¶¶ 54-55)

### II.    THE PITCHf/x SYSTEM AND THE ENDEAVOR CONTRACT

In 1999, ESPN and Sportvision engineers collaborated on an idea to create a new system capable of (1) generating and inserting a virtual strike zone graphic, custom-sized for each batter, during broadcasts of MLB games; and (2) generating and inserting a virtual pitch location graphic showing the location of where the last pitch crossed home plate relative to the virtual strike zone.  (Id. ¶ 64)  ESPN called this proposed on-air enhancement the "K-Zone."  (Id. ¶ 66)

After approximately eighteen months, Sportvision completed development of the K-Zone system, and ESPN began using it on July 1, 2001.  (Id. ¶¶ 68, 71)  For the next five years, ESPN was the only MLB broadcaster with the right to use the K-Zone system.  (Id. ¶ 75)  During that time, the use of the K-Zone in ESPN broadcasts enjoyed positive fan reception, but the system had inherent limitations.  (Id. ¶ 77)  In particular, the technology was limited to

---

[1]  The following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendant's motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

tracking the flight of the pitch over home plate only.  Moreover, because the pitch tracking technology had an inherent one second delay before the system reported the location of the pitch, K-Zone's Virtual Pitch Location Reveals were available only on replays.  (Id.)  Sportvision engineers resolved to create a faster, more complete, baseball tracking system.  (Id.)

Sportvision engineers worked to "develop and then patent a new and sophisticated camera-based pitch tracking system that could track detailed information along the entire trajectory of a pitch, i.e., from the pitchers' release point through to the catchers' mitt."  (Id. ¶ 96)  On March 11, 2008, Patent No. 7,341,530 ("the '530 Patent") – entitled "Virtual Strike Zone" – was issued.  (Id. ¶¶ 78-79, Ex. A)  ESPN and Sportvision each held an undivided joint ownership interest in the '530 Patent until October 4, 2016, when SMT acquired Sportvision, and Sportvision assigned its interest to SMT.  (Id. ¶¶ 80-81)  SMT became the sole owner of the '530 Patent on February 1, 2017, when ESPN assigned its interest in the '530 Patent to SMT.  (Id. ¶¶ 82-83)  "The claims of the '530 Patent are directed to systems and methods that determine the location of the strike zone and add a graphical image of the strike zone to a video or other image of a baseball game."  (Id. ¶ 84)  Sportvision alleges that the "graphical renderings of strike zones and pitches through Sportvision's K-Zone system practice at least claim 31" of the '530 Patent.  (Id. ¶ 90)

Sportvision called its new, full pitch path tracking system "PITCHf/x."  PITCHf/x is capable of deriving the location, angle, amount of break, speed at release, and speed as the ball crosses home plate.  (Id. ¶¶ 97-98)  PITCHf/x also can predict the location of where a pitch will cross home plate to within one-inch accuracy before it happens, which allowed Sportvision to build a system that could insert pitch location graphics into live video.  (Id. ¶¶ 99-100)  Sportvision engineers also designed and developed a database system to store all of PITCHf/x

pitch path data, and designed a distribution interface system to make the pitch data available in a variety of formats to serve different data consumption uses.  (Id. ¶ 101)

While PITCHf/x was being developed, ESPN's use of the K-Zone system increased the market demand for all forms of MLB pitch data, as well as the market demand for a broadcast alternative to K-Zone that could be used by other MLB broadcasters.  (Id. ¶ 95) Accordingly, to maximize monetization of its new technology, in 2005 Sportvision proposed to Advanced Media that Sportvision would (1) permanently install a PITCHf/x system in every MLB Stadium; (2) operate the PITCHf/x system for every MLB game; (3) record the pitch path trajectory for every pitch thrown in every MLB game; and (4) make the pitch data in various formats available to a variety of users and use cases, including live pitch data graphic renderings, replay pitch data graphic renderings, and post-game digital summaries and reports.  (Id. ¶ 102) After Sportvision's presentation, Sportvision and Advanced Media began negotiating and finalizing the structure and terms of an agreement that contemplated installing the PITCHf/x system and Sportvision rendering systems in every MLB stadium.  (Id. ¶ 104)

On February 7, 2006, Sportvision and Advanced Media entered into a contract to "work together on an endeavor to capture, collect, market and disseminate pitch data" in MLB games using the PITCHf/x system (the "Contract").  (Id. ¶ 107)  The Contract lists four primary objectives:  (1) to design, assemble, install league-wide, and operate the PITCHf/x system to capture data on pitches at MLB games; (2) to provide PITCHf/x system data to MLB-associated entities at no charge; (3) to generate revenue by selling PITCHf/x system data rendering services to MLB broadcasters; and (4) to generate revenue by selling PITCHf/x system data to data subscribers.  (Id.)

Plaintiffs describe the parties' business arrangement as follows:  Advanced Media agreed to (1) pay all expenses associated with the first objective, in exchange for permission to perform the second objective and a share in the revenue generated by the third and fourth objectives. (Id. ¶ 109)  Plaintiffs agreed to supply the patents, intellectual property, and expertise needed to perform the first objective, in exchange for a share in the revenue generated by the third and fourth objectives.  (Id.)

Plaintiffs allege that the Contract ran through 2019, but that Advanced Media abandoned the parties' joint venture after the 2016 baseball season, hiring Ryan Zander, Sportvision's former Executive Vice President and General Manager of Baseball Products, to develop a competing system – the PITCHcast system – using Sportvision's trade secrets.  (Id. ¶¶ 30, 38, 173-77)  Plaintiffs further allege that, beginning with the 2017 baseball season, Advanced Media has used the PITCHcast system, and not the PITCHf/x system provided by Sportvision pursuant to the Contract.  (Id. ¶ 178)

## III.   **PLAINTIFFS' CLAIMS**

The Amended Complaint's "first claim for relief" is brought by SMT for patent infringement.  (Id. ¶¶ 243-58)  SMT claims that Advanced Media's PITCHcast System infringes "at least" Claim 31 of the '530 Patent.  (Id. ¶¶ 179-90, 243-58)  According to the Amended Complaint, the claims of the '530 Patent are "directed to systems and methods that determine the location of the strike zone and add a graphical image of the strike zone to a video or other image of a baseball game."  (Am. Cmplt. (Dkt. No. 26) ¶ 84)

The Second and Third Claims for Relief are brought by Sportvision for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq., and common law misappropriation of trade secrets.  (Id. ¶¶ 259-90)  Sportvision alleges that

Advanced Media hired Zander and relied on Sportvision's trade secrets to shortcut the development and licensing of a system to replace the PITCHf/x system.  (See, e.g., id. ¶ 216)  The trade secrets allegedly misappropriated by Advanced Media include both confidential technical and business information, such as testing and calibration trade secrets, broadcast display trade secrets, deployment trade secrets, and MLB broadcaster contract negotiation trade secrets.  (Id. ¶¶ 151-55)

The Fourth through Ninth Claims for Relief are brought by Sportvision for breach of contract.  (Id. ¶¶ 291-351)  The Fourth Claim for Relief alleges that Advanced Media breached its "Operational Obligations" under the Contract.  (Id. ¶¶ 291-301)  These "Operational Obligations" require Advanced Media to (1) fund the Capital Equipment Budget; (2) hire the Equipment Operators; (3) provide Sportvision access to stadiums and facilities; (4) provide contextual game data and the means to conflate that data with the PITCHf/x data; (5) host the PITCHf/x Master Database with current pitch tracking data; (6) provide Sportvision with undisturbed, real-time electronic access to the PITCHf/x Master Database; (7) pay all Total Expenses for the operation of the PITCHf/x System on an annual basis; (8) work in good faith to exploit all reasonable business opportunities for selling the PITCHf/x System Data; and (9) perform all obligations under the Contract in a timely, professional, competent, and workmanlike manner.  (Id. ¶ 292)  The Amended Complaint alleges that, since the start of the 2017 baseball season, Advanced Media has not performed any of these "Operational Obligations."  (Id. ¶ 295)

The Fifth Claim for Relief alleges that Advanced Media breached Section 4.1 of the Contract, the exclusivity provision.  (Id. ¶¶ 302-311)  Section 4.1 provides that, "[d]uring the Term, [Advanced Media] agrees that it shall not enter into any arrangement with any third party other than Sportvision for purposes of providing the same data as that provided by the PITCHf/x

System . . . ."  (Id., Ex. B (Contract) (Dkt. No. 26-2) § 4.1; Id., Ex. C (First Amendment to

Contract) (Dkt. No. 26-3) § 4.1)  The Amended Complaint alleges that Advanced Media

breached Section 4.1 by contracting with third parties Trackman and ChyronHego to replace

certain data or services previously provided by the PITCHf/x system.  (Id. ¶¶ 304-07)

The Sixth Claim for Relief alleges that Advanced Media breached Section 7.5 of

the Contract.  (Id. ¶¶ 312-325)  Under Section 7.5, the parties agreed that they would not "(i)

copy, modify, create any derivative work of, or include in any other products any of [intellectual

property] of the other Party or any portion thereof, or (ii) reverse assemble, decompile, reverse

engineer or otherwise attempt to derive source code (or the underlying ideas, algorithms,

structure or organization) from the other Party's [intellectual property.]"  (Contract (Dkt. No. 26-

2) § 7.5)  According to the Amended Complaint, Advanced Media used core components of the

PITCHf/x system to assess, refine, and drive the PITCHcast System development, testing, and

deployment.  (Am. Cmplt. (Dkt. No. 26) ¶¶ 314-17)

The Seventh Claim for Relief alleges that Advanced Media breached Section 2.4

of the Contract, in which Advanced Media agreed, inter alia, that it would "notify Sportvision in

writing of additional data sets which it desires to implement and/or develop," and to give

Sportvision the first opportunity to develop and implement those data sets.  (Id. ¶ 326-33)

According to the Amended Complaint, Advanced Media contracted with Trackman for a system

to measure pitch rotations, and with ChyronHego to track player movements vis-à-vis pitches

thrown, without notifying Sportvision of these additional data sets or giving Sportvision an

opportunity to bid.  (Id. ¶¶ 328-30)

The Eighth Claim for Relief alleges that Advanced Media breached Section 8.2 of

the Contract, another exclusivity provision.  (Id. ¶¶ 334-341)  Section 8.2 provides that, "either

Party (the "Receiving Party") that receives Confidential Information from the disclosing Party

(the "Disclosing Party") will not use or disclose to any third party the Confidential Information

. . . ."  (Contract (Dkt. No. 26-2) § 8.2)  The Amended Complaint alleges that, in working with

certain third parties to replace key components of PITCHf/x System with third party-provided

components, Advanced Media engaged in processes that revealed confidential information to

those third parties.  (Am. Cmplt. (Dkt. No. 26) ¶ 336)

The Ninth Claim for Relief alleges that Advanced Media breached its obligations

under the Contract to negotiate in good faith with Sportvision for the 2017 MLB season.  (Id. ¶¶

342-351)

## DISCUSSION

## I.   DEFENDANT'S MOTION TO COMPEL ARBITRATION

Advanced Media argues that this Court should compel arbitration of Sportvision's

misappropriation of trade secrets and breach of contract claims pursuant to an arbitration clause

in the Contract.  (Def. Br. (Dkt. No. 44) at 9)[2]  Defendant further argues that – if the Court

determines that some of Plaintiffs' claims are not subject to arbitration – the Court should stay

those claims pending the outcome of arbitration "[t]o avoid potentially conflicting rulings" and

"streamline discovery on overlapping issues."  (Id. at 21)

### A.   Applicable Law

When confronted with a motion to compel arbitration, a court must conduct the

following inquiries:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must
> determine the scope of that agreement; third, if federal statutory claims are
> asserted, it must consider whether Congress intended those claims to be
> nonarbitrable; and fourth, if the court concludes that some, but not all, of the

---

[2]  The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004) (citation omitted).

The Second Circuit has prescribed a two-step inquiry to determine whether claims are arbitrable under an arbitration clause:

> First, . . . a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability[,] and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks and citations omitted); see also Allstate Ins. Co. v. Mun, 751 F.3d 94, 97 (2d Cir. 2014) (courts should apply the presumption favoring arbitration "'only where it reflects . . . a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and . . . is legally enforceable and best construed to encompass the dispute'") (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 303 (2010)) (emphasis and alterations in original).

A clause "submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause." Collins & Aikman Prod. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (quoting David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 251 (2d Cir. 1991)) (alterations in original). "'[N]arrow clauses [] limit arbitration to specific types of disputes . . . [and are] not the sort of broad clause in which parties agree 'to submit to arbitration disputes "of any nature or character," or simply "any and all disputes . . . .""' McDonnell Douglas Fin. Corp. v.

Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (quoting Rochdale Village,

Inc. v. Public Serv. Employees Union, 605 F.2d 1290, 1295 (2d Cir. 1979)).  Use of a narrow

arbitration clause demonstrates the parties' intent to limit arbitration to the specific types of

disputes referenced in the clause.  See Negrin v. Kalina, No. 09 CIV 6234, 2010 WL 2816809, at

*5 (S.D.N.Y. July 15, 2010) ("[T]he [narrow] arbitration clause here refers to certain subsets of

covered disputes . . . . 'The parties' use of precise language in the arbitration clause suggests an

intent to limit arbitration to a particular subset of disputes.'") (quoting Fabry's S.R.L. v. IFT

Intern., Inc., No. 02 Civ. 9855(SAS), 2003 WL 21203405, at *5 (S.D.N.Y. May 21, 2003)).

        "'When "dealing with a narrower arbitration clause, . . . it will be proper to

consider whether the conduct in issue is on its face within the purview of the clause.'" . . . Thus,

though even a narrow arbitration clause must be construed in light of the presumption in favor of

arbitration, the court is not free to disregard the explicit boundaries set by the agreement between

the parties."  Chevron U.S.A. Inc., By & Through Chevron Res. Co. v. Consol. Edison Co. of

New York, 872 F.2d 534, 537-38 (2d Cir. 1989) (quoting McAllister Bros. v. A & S Transp. Co.,

621 F.2d 519, 522 (2d Cir. 1980) (quoting Rochdale Village, 605 F.2d at 1295)).  "[I]n

construing the scope of [a narrow] clause, [the court] must be careful to carry out the specific and

limited intent of the parties.  Although [the court] must be mindful of the federal presumption in

favor of arbitration, [the court] cannot allow that presumption to have the strong effect here that

it would have if [the court] were construing a broad arbitration clause."  McDonnell Douglas,

858 F.2d at 832 (citations omitted).  "In determining whether a particular dispute falls within the

scope of a narrow and specific arbitration clause, '[t]he tone of the clause as a whole must be

considered.'"  Id. (quoting Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2d Cir.

1983)).

B.     **The Contract's Dispute Resolution Provisions**

Section 13.10 of the Contract addresses dispute resolution:

Except as set forth below, the parties consent to the exclusive jurisdiction and venue of any court of competent jurisdiction sitting within the State of New York, County of New York with respect to any dispute arising out of or relating to this Agreement.  In the event of any dispute regarding the operation of the Endeavor, including, without limitation, an[y] disagreement as to the Capital Equipment Budget, Endeavor Budget, Total Expenses, Revenues, revenue opportunities, marketing, installation schedule, or other similar disagreement, the Parties agree to submit the dispute to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

(Contract (Dkt. No. 26-2) § 13.10; First Amendment to Contract (Dkt. No. 26-3) § 13.10)

The Contract elsewhere defines the "Endeavor" as "the respective obligations of the parties for the development, assembly and installation of the PITCHf/x System and the capture, collection, marketing[,] and dissemination of PITCHf/x System Data as set forth in this Agreement."  (Contract (Dkt. No. 26-2) § 1)

The language and structure of Section 13.10 suggest a narrow arbitration clause.[3] The first sentence of Section 13.10 sets out a generally applicable rule that "any dispute arising out of or relating to [the] Agreement" will proceed in "any court of competent jurisdiction" in the State and County of New York.  Those courts will have "exclusive jurisdiction" over the parties' disputes, "[e]xcept as set forth below."  (Id. § 13.10)

The second sentence of Section 13.10 carves out an exception to this general rule, providing that disputes about certain matters – those "regarding the operation of the Endeavor, including, without limitation, . . . the Capital Equipment Budget, Endeavor Budget, Total Expenses, Revenues, revenue opportunities, marketing, installation schedule, or other similar disagreement" – are to be resolved through arbitration.  (Id.)

---

[3]  Defendant does not argue otherwise.

In sum, the language and structure of Section 13.10 do not evince an intent that every dispute arising out of the Contract be submitted to arbitration.  Section 13.10 instead "limit[s] arbitration to specific types of disputes . . . [and is] not the sort of broad clause in which parties agree to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes. . . .'"  McDonnell Douglas, 858 F.2d at 832 (internal quotation marks and citation omitted).

The Court concludes that the arbitration clause in Section 13.10 is "narrow." Accordingly, this Court must consider "whether the conduct in issue is on its face within the purview of the clause" in light of "the explicit boundaries set by the agreement between the parties."  Chevron, 872 F.2d at 537-38.  The Court must also consider "[t]he tone of the clause as a whole."  Finally, the Court "cannot allow ['the federal presumption in favor of arbitration'] to have the strong effect here that it would have if [the court] were construing a broad arbitration clause."  McDonnell Douglas, 858 F.2d at 832.

### C.   The Parties' Arguments Regarding Scope

Plaintiffs do not dispute the validity of the arbitration provision, nor do they contend that Congress did not intend the claims at issue to be arbitrable.  Plaintiffs instead argue that their claims do not fall within the scope of the arbitration provision.  (Pltf. Opp. Br. (Dkt. No. 45) at 13-14)  According to Plaintiffs, the crux of the Amended Complaint's misappropriation of trade secret and breach of contract claims is that Defendant abandoned the Contract and misappropriated Plaintiffs' technology, using it to develop Defendant's own competing PITCHcast system.  Plaintiffs contend that this gross abandonment of the Contract and misappropriation of Plaintiffs' trade secrets does not fall within the purview of the

arbitration clause.  (Pltf Br. (Dkt. No. 45) at 11; see also Am. Cmplt. (Dkt. No. 26) ¶¶ 299, 309, 322, 331, 339, 348)

Defendant argues, however, that Plaintiffs' misappropriation of trade secrets and breach of contract claims are facially within the purview of the arbitration clause.  (Def. Br. (Dkt. No. 44) at 12)  Defendant further contends that, "as the party resisting arbitration, Plaintiffs have the burden of proving that the [misappropriation of trade secret and breach of contract claims raise issues that] are 'collateral' to the agreement."  (Def. Reply Br. (Dkt. No. 46) at 7 (citing Prudential Lines, 704 F.2d at 64))

Acknowledging "the federal presumption in favor of arbitration," and the burden that thereby falls on a party resisting arbitration, the Court also acknowledges that the presumption has less "strong effect here," because the arbitration clause at issue is narrow. McDonnell Douglas, 858 F.2d at 832.

### D.    Whether Plaintiffs' Misappropriation of Trade Secret Claims Are Subject to Arbitration

The Amended Complaint's Second and Third Claims for Relief allege that Defendant "has misappropriated Sportvision's trade secrets beginning at least since Mr. Zander's employment with [Advanced Media] in October 2016," in violation of 18 U.S.C. § 1836 et seq. and New York common law.  (Am. Cmplt. (Dkt. No. 26) ¶¶ 266, 284)

Plaintiffs allege that "[i]n November 2016 . . . SMT's [chief operating officer], Kirk Brown, reached out to Mr. Zander, [then at Advanced Media], to discuss operational and revenue sharing arrangements relating to the Endeavor Contract[.]"  "Mr. Zander . . . informed Mr. Brown that discussion on that topic would not begin until December 2016[.]"  "On December 21, 2016[,] . . . Mr. Zander told Mr. Brown that [Advanced Media] had made the

decision to cease using PITCHf/x for the 2017 MLB season." (Am. Cmplt. (Dkt. No. 26) ¶¶ 191-94)

Plaintiffs allege that Defendant stopped using the PITCHf/x system – and abandoned the Endeavor – because it had developed a competing system, using Plaintiffs' technology. Plaintiffs allege that Defendant hired Zander – their former Executive Vice President and General Manager of Baseball Products – obtained Plaintiffs' trade secrets through him, and used Plaintiffs' trade secrets to expedite the development and licensing of a competing system – a system that Defendant used to replace the PITCHf/x system. (See, e.g., id. ¶ 216) As discussed above, Plaintiffs claim that Defendant misappropriated Plaintiffs' confidential technical and business information regarding testing and calibration, broadcast display, deployment of the PITCHf/x system in MLB stadiums, and the terms of MLB broadcaster contracts. (Id. ¶¶ 151-55)

Defendant argues that a "fact-finder cannot resolve any of Sportvision's trade secret claims without delving into the parties' actions and obligations regarding the operation of the Endeavor," including "Mr. Zander's role in the operation of the Endeavor; how the PITCHf/x System was installed and operated; and whether [Advanced Media] used Mr. Zander's 'operational know-how' to develop PITCHcast." (Def. Br. (Dkt. No. 44) at 17)

Plaintiffs contend that their trade secret misappropriation claims "do not involve the 'operation of the Endeavor,' and instead concern particular actions taken as part of [Advanced Media's] plan to abandon its contract." (Pltf. Opp. Br. (Dkt. No. 45) at 17) Plaintiffs assert that Advanced Media hired Zander and used trade secrets he provided "to develop, implement, deploy and monetize a competing pitch-tracking system, and not [for] the 'operation of the Endeavor.'" (Id.) Relying on Plaintiffs' trade secrets, Defendant "use[d] the PITCHf/x

system as a benchmark for side-by-side testing, unit testing, and/or regression testing to configure PITCHcast"; "swap[ped] out Sportvision components from within the PITCHf/x system in place at MLB stadiums and replace[d] them with [Advanced Media] components"; and "replace[d] components of PITCHf/x with PITCHcast's new radar system at each MLB stadium."  (Am. Cmplt. (Dkt. No. 26) ¶¶ 234, 236)

In sum, Plaintiffs allege that Defendant hired Zander for the specific purpose of stealing Plaintiffs' technology, so that Defendant could develop and deploy its own competing PITCHcast system.  Defendant's development of this competing system allowed it to abandon the PITCHf/x system and the Endeavor.

The Court concludes that Plaintiffs' misappropriation of trade secrets claims do not fall within the arbitration provision, because these claims do not arise out of "the operation of the Endeavor."  To the contrary, Plaintiffs claim that Defendant abandoned the Contract after the 2016 baseball season, hired Zander, obtained Plaintiffs' trade secrets from him, and used Plaintiffs' trade secrets to develop a competing product.  Defendant does not, and could not reasonably contend, that the arbitration clause governs disputes arising out of Defendant's handling of Plaintiffs' trade secrets, particularly in connection with Defendant's development of a competing product.  Moreover, analyzing Defendant's conduct after it allegedly abandoned the Endeavor will not require the fact-finder to delve into the details of Advanced Media's operational obligations under the Contract.

Because Plaintiffs' misappropriation of trade secrets claims do not involve the "operation of the Endeavor," these claims are not within the scope of the arbitration provision, and Defendant's motion to compel arbitration will be denied as to these claims.

E.      **Whether Plaintiffs' Breach of Contract Claims Are Subject to Arbitration**

1.      **Defendant's Alleged Breaches**

a.      **Breach of "Operational Obligations"**

The Amended Complaint's Fourth Claim for Relief lists nine "Operational Obligations" that Defendant "has refused to honor" and "has failed to perform" since the start of the 2017 baseball season.  (Am. Cmplt. (Dkt. No. 26) ¶¶ 292, 294-95)  Plaintiffs allege that Defendant's breach of its "Operational Obligations" "destroyed Sportvision's ability to perform its contractual obligations to MLB Broadcasters and prevented Sportvision from entering into new contracts with MLB Broadcasters . . . ."  (Id. ¶ 297)

Defendant contends that "Sportvision cannot avoid arbitration when it admits [that] this Count relates to 'Operational Obligations' and its allegations use the exact language covered by the arbitration clause."  (Def. Br. (Dkt. No. 44) at 13)

Plaintiffs argue, however, that this breach claim "is not about the way in which [Defendant] performed its operations," but instead addresses Defendant's complete "fail[ure] to perform any of the Operational Obligations set forth in Sections 3.2, 3.3, 3.4, 3.5, 3.6, 4.1, 5.3, and 9.3 of the Endeavor Contract."  (Pltf. Opp. Br. (Dkt. No. 45) at 11)

b.      **Breach of Exclusivity Provision**

The Amended Complaint's Fifth Claim for Relief asserts that, "[b]y virtue of its agreements with third parties, Advanced Media has breached its obligations under Section 4.1 of the . . . Contract."  (Am. Cmplt. (Dkt. No. 26) ¶¶ 308)  Section 4.1 of the Contract provides that, "[d]uring the Term, [Advanced Media] . . . shall not enter into any arrangement with any third party other than Sportvision for purposes of providing the same data as that provided by the PITCHf/x System . . . ."  (Contract (Dkt. No. 26-2) § 4.1)

16

In the Amended Complaint, Plaintiffs allege that Defendant "contracted with third parties . . . to provide the same data and/or services"; "replaced Sportvision's PITCHf/x Tracking System with a Trackman Radar Tracking System"; "replaced Sportvision's Video-Based Strike-Zone Sizing System with an Auditor System"; and "replaced Sportvision's Rendering Systems with ChyronHego Rendering Systems." (Id. ¶¶ 304-08)

Defendant points out that Section 4.1 of the Contract "is entitled 'Marketing Efforts' and governs the parties' marketing obligations." According to Defendant, in the Contract "[t]he parties expressly identified 'marketing' as one of the illustrative examples of categories that should be arbitrated." (Def. Br. (Dkt. No. 44) at 13) Defendant further notes that "the parties agreed to arbitrate disputes about 'revenue opportunities[,]' [including] whether [Advanced Media] was required to commercially exploit certain data jointly with Sportvision or permitted to enter into an arrangement with third parties." (Id.)

Plaintiffs contend that this breach claim "alleges that, since electing to cease performance under the Endeavor Contract, [Advanced Media] has contracted with third parties, thus breaching the Endeavor Contract's exclusivity provisions." (Pltf. Opp. Br. (Dkt. No. 45) at 11)

### c.     Breaches Regarding Reverse Engineering and Disclosure of Plaintiff's Intellectual Property

The Amended Complaint's Sixth Claim for Relief alleges that Advanced Media violated Section 7.5 of the Contract by "hir[ing] Mr. Zander – who has intimate knowledge of every aspect of PITCHf/x and the Sportvision IP inherent in the PITCHf/x system – to oversee the final phase of the implementation, reverse engineering, unit testing and regression testing, and deployment of the PITCHcast System." (Am. Cmplt. (Dkt. No. 26) ¶ 314) Under Section 7.5, the parties agreed that they would not "(i) copy, modify, create any derivative work of, or

include in any other products any of [intellectual property] of the other Party or any portion thereof, or (ii) reverse assemble, decompile, reverse engineer or otherwise attempt to derive source code (or the underlying ideas, algorithms, structure or organization) from the other Party's [intellectual property]."  (Contract (Dkt. No. 26-2) § 7.5)

The Eighth Claim for Relief alleges that Advanced Media violated Section 8 of the Contract by "working with certain third parties to replace key Sportvision components of PITCHf/x System with third party-provided components," thereby "engag[ing] in processes that reveal to those third parties Sportvision Confidential Information . . . ."  (Am. Cmplt. (Dkt. No. 26) ¶ 336)  "Section 8.2 of the . . . Contract provides that "either Party . . . that receives Confidential Information from the disclosing Party . . . will not use or disclose to any third party the Confidential Information. . . ."  (Contract (Dkt. No. 26-2) § 8.2)

Defendant argues that, in order "[t]o understand whether the actions alleged in these Counts constitute a breach of the . . . Contract, the fact-finder will need to determine what information belonged to which party, who became aware of the information throughout the development and operation of the PITCHf/x System, and what information was revealed during operations."  (Def. Br. (Dkt. No. 44) at 13-14)  Defendant further argues that Plaintiffs "cannot argue that [Advanced Media] breached contractual provisions that were integral to operating the Endeavor, while at the same time arguing that a dispute over such provisions falls outside the [arbitration agreement]."  (Id. at 15)

Plaintiffs argue, however, that Defendant's "replacement of the PITCHf/x system with what [Advanced Media] claims is its own system . . . occurred in concert with [Advanced Media's] abandonment of the Endeavor Contract."  Further, Defendant "'work[ed] with certain

third parties to replace' the PITCHf/x system . . . as a 'result of [Advanced Media's] willful abandonment of its obligations.'" (Pltf. Opp. Br. (Dkt. No. 45) at 11)

### d. <u>Breach of Right of First Refusal</u>

The Amended Complaint's Seventh Claim for Relief alleges that Defendant violated Section 2.4 of the Contract by, "without either notifying Sportvision or providing Sportvision its first right to bid, [contracting] with Trackman for a Radar Tracking System to measure pitch rotations . . . [and] with ChyronHego to track player movements vis-à-vis pitches thrown." (Am. Cmplt. (Dkt. No. 26) ¶¶ 328-29) Under Section 2.4 of the Contract, Advanced Media is obligated to "notify Sportvision in writing of additional data sets which it desires to implement and/or develop . . . Upon [Advanced Media's] request, Sportvision may elect to use its commercially reasonable efforts to develop and implement such additional data sets[.]" (Contract (Dkt. No. 26-2) § 2.4)

Defendant argues that "[a] fact-finder cannot determine whether [Advanced Media] complied . . . without first evaluating what data sets were already captured by the PITCHf/x System . . . and what steps the parties were required to take when developing "additional data sets." (Def. Br. (Dkt. No. 44) at 15) Defendant further argues that this breach claim "raises the question of whether [Advanced Media] fulfilled its obligation to exploit 'revenue opportunities' with Sportvision, an express category of disputes subject to arbitration." (<u>Id.</u>)

Plaintiffs contend, however, that because of Defendant's "abandonment of the [C]ontract," it failed "to provide Sportvision with a right of first refusal to develop additional data for the PITCHf/x system." (Pltf. Opp. Br. (Dkt. No. 45) at 11)

### e.     <u>Breach Regarding Duty to Negotiate</u>

The Amended Complaint's Ninth Claim for Relief alleges that Advanced Media

violated Sections 4.1 and 12.1(c) of the Contract by "refusing to negotiate [with Plaintiffs] for

the 2017 [baseball] season."  (Am. Cmplt. (Dkt. No. 26) ¶ 347)  Section 12.1 of the Fourth

Amendment to the Contract requires the parties "to negotiate in good faith to continue the

commercial exploitation of PITCHf/x Derivative Data beyond the 2016 MLB season . . . ."  (Am.

Cmplt., Ex. F (Fourth Amendment to Contract (Dkt. No. 26-6) § 12.1)  Section 4.1 of the

Contract requires that "[d]uring the Term of this Agreement, the Parties will work together in

good faith to explore and exploit all reasonable business opportunities for the marketing, sale and

licensing of the PITCHf/x System Data to maximize revenues for the Endeavor . . . ."  (Contract

(Dkt. No. 26-2) § 4.1)

Defendant argues that this breach claim "boils down to a dispute about whether

[Advanced Media] was required to pursue further 'revenue opportunities' with Sportvision for

the 2017 season . . . ."  (Def. Br. (Dkt. No. 44) at 16)

Plaintiffs contend, however, that because of Advanced Media's "abandonment of

the [C]ontract," it refused to "work together in good faith [with Plaintiffs]" or "negotiate in good

faith with respect to the business terms for the 2017 Season."  (Pltf. Opp. Br. (Dkt. No. 45) at 11-

12)

### 2.     <u>Analysis</u>

As is apparent for the above summary of the parties' arguments concerning

Plaintiffs' breach of contract claims, Defendant's primary argument is that Plaintiffs' breach

claims will require the fact-finder to interpret portions of the Contract, and determine whether

Defendant breached its obligations under these provisions.  <u>See</u>, <u>e.g.</u>, Def. Br. (Dkt. No. 44) at

14-20; Def. Reply Br. (Dkt. No. 46) at 8.  Defendant contends that the parties agreed in the
Contract that disputes about various aspects of the "operation of the Endeavor," including
budget, expenses, revenue, and marketing would be resolved through arbitration, and that
accordingly Plaintiffs may not pursue these claims in court.

        As discussed above, however, the parties agreed generally that a court of
competent jurisdiction in Manhattan would hear "any dispute[s] arising out of or relating to this
Agreement."  (Am. Cmplt., Ex. B (Contract) (Dkt. No. 26-2) § 13.10; Am. Cmplt., Ex. C (First
Amendment to Contract (Dkt. No. 26-3) § 13.10)  The arbitration clause is a carve-out for
disputes "regarding operation of the Endeavor, including without limitation, an[y] as to the
Capital Equipment Budget, Endeavor Budget, Total Expenses, Revenues, revenue opportunities,
marketing, [and] installation schedule, or other similar disagreement."  (Id.)

        Plaintiffs' breach of contract claims are not about the "operation of the
Endeavor," however.  Instead, Plaintiffs' breach claims all flow directly from Defendant's
alleged abandonment of the Contract, and alleged decision to use Plaintiffs' intellectual property
to develop a competing product.  Accordingly, these breach claims do not fall within the scope of
the arbitration provision.  Construing the arbitration clause in this manner is consistent with the
language and structure the parties chose to employ, which is a carve-out from a provision that
generally provides for a judicial forum.  It is also consistent with Louis Dreyfus Negoce, which
distinguishes as non-arbitrable "collateral issue[s] that [are] somehow connected to the main
agreement."  252 F.3d at 224.  The "collateral issues" here are Defendant's alleged abandonment
of the Contract in toto, and alleged decision to use Plaintiffs' intellectual property to develop a
competing product.

Defendant's arguments to the contrary are not persuasive.  First, Defendant argues that "[t]here is nothing in the clause limiting arbitration to disputes involving 'current' or 'ongoing' operations" (Def. Reply Br. (Dkt. No. 46) at 7), and points out that the parties "expressly agreed that the arbitration clause would survive 'any expiration or termination' of the Contract."  (Id. at 8 (citing Contract (Dkt. No. 26-2) § 12.3))  But the issue here is not whether the Contract expired or was terminated.  Instead, the Amended Complaint pleads facts demonstrating that Defendant has engaged in a wholesale abandonment of the Contract, having decided to use Plaintiff's intellectual property to develop and market a competing product. These allegations do not implicate "the operation of the Endeavor."

Defendant cites McAllister Bros. v. A & S Transp. Co., 621 F.2d 519 (2d Cir. 1980) and R. H. Macy & Co. v. Nat'l Sleep Prod., Inc., 39 N.Y.2d 268 (1976) for the proposition that "a dispute about abandonment is really a dispute about ongoing performance."  (Def. Reply Br. (Dkt. No. 46) at 9)

In McAllister Bros., the arbitration clause stated that "[defendant] shall have the right to seek Tugboat service elsewhere only if the service rendered by [plaintiff] does not meet the standards of the industry and any disagreement with respect to this issue shall be settled in . . . arbitration . . . ."  McAllister Bros., 621 F.2d at 521.  The court found that "the claim of abandonment is inextricably tied up with the merits of the underlying dispute," because "not providing tugs at all would not satisfy the standards of the industry, so that an arbitrable issue is raised."  Id. at 523.

Here, by contrast, there is no "standards of the industry" issue for an arbitrator to interpret.  Instead, there is a claim that Defendant breached the Contract in its entirety by failing to perform any of its obligations.

In <u>R. H. Macy</u>, the arbitration clause stated, "(i)n the event of any dispute as to the performance of any provision of this agreement, same shall be submitted to arbitration."  <u>R. H. Macy</u>, 39 N.Y.2d at 270 (internal quotations omitted).  The court ruled that

> "[p]erformance" may be defined as "(t)he fulfillment or accomplishment of a promise, contract or other obligation according to its terms" (Black's Law Dictionary (4th ed)).  The claim [of abandonment] is a question intimately related to performance because . . . it is premised on the nonfulfillment of contractual obligations and the failure to accomplish the terms of the agreement."

<u>Id.</u> at 271.

<u>R. H. Macy</u> is not on point, because it involves a broad arbitration clause, which triggers "a presumption of arbitrability."  <u>Louis Dreyfus Negoce</u>, 252 F.3d at 224.  The narrow arbitration clause at issue here triggers no such presumption.  Moreover, the "performance of any provision of this agreement" language at issue in <u>R.H. Macy</u> is far different from the arbitration clause at issue here, which contains no such language and instead lists specific examples of covered disputes.  <u>Id.</u> at 270.  Finally, "performance of any provision of this agreement" is significantly broader than "operation of the Endeavor," particularly as qualified in the Contract.

Because Plaintiffs' breach of contract claims are premised on Defendant's alleged abandonment of the Contract <u>in toto</u>, they do not fall within the scope of the arbitration clause.  Accordingly, Defendant's motion to compel will be denied as to these claims.

## II.     DEFENDANT'S MOTION TO DISMISS <u>PLAINTIFFS' PATENT INFRINGMENT CLAIM</u>

Defendant has moved to dismiss the Amended Complaint's First Claim for Relief, which is premised on Plaintiffs' assertion that Defendant Advanced Media has infringed on Claim 31 of the '530 patent.  (Am. Cmplt. (Dkt. No. 26) ¶¶ 243-258)

Claim 31 reads as follows:

A method of providing strike zone information, comprising the steps of:

determining a location of a strike zone for a first batter by receiving an indication of one or more positions on said first batter in an image of said first batter and using said indicated positions to automatically calculate height and a three dimensional volume of said strike zone;

determining a first position in a video, said first position corresponding to said location of said strike zone; and

adding an image for said strike zone to said video at said first position, wherein said step of determining the first position includes:

converting the three dimensional volume of said strike zone to two-dimensional locations within the video using data in video.

(Am. Cmplt. (Dkt. No. 26) ¶ 245; see also '530 Patent (Dkt. No. 26-1) at 14)

Defendant argues that Plaintiff's patent infringement claim should be dismissed, because Claim 31 "is invalid for claiming ineligible subject matter." (Def. Br. (Dkt. No. 44) at 21) According to Defendant, Claim 31 is "directed to the abstract idea of collecting, manipulating, and displaying strike zone information," and does not "add an inventive step in order to claim patentable subject matter." (Id. at 21-22)

A.    **Applicable Law**

Under Section 101 of the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized three implicit exceptions to Section 101's coverage: "laws of nature, natural phenomena, and abstract ideas." Bilski v. Kappos, 561 U.S. 593, 601 (2010).

The Supreme Court has articulated a two-step framework for determining patent validity, which is referred to as the Alice test. See Alice Corp. Pty. v. CLS Bank Int'l, 573 U.S. 208 (2014). Under the first step, the court must "determine whether the claims at issue are

24

directed to a patent-ineligible concept." Id. at 218.  Under the second step, the court must

"examine the elements of the claim to determine whether it contains an 'inventive concept'

sufficient to 'transform' the claimed abstract idea into a patent-eligible application." Id. at 221.

Patent validity under Section 101 presents a question of law that may be

determined on the pleadings.  See In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607 (Fed.

Cir. 2016) (granting Rule 12(b)(6) motion to dismiss where patented process was abstract, and

thus patent-ineligible); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709 (Fed. Cir. 2014) (same);

Multimedia Plus, Inc. v. Playerlync, LLC, 198 F. Supp. 3d 264, 266 (S.D.N.Y. 2016) (noting that

"courts have frequently decided questions of patent eligibility on the pleadings").

Moreover, under certain circumstances, a court may determine Section 101

validity prior to formal claim construction.  See Content Extraction & Transmission LLC v.

Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("Although the

determination of patent eligibility requires a full understanding of the basic character of the

claimed subject matter, claim construction is not an inviolable prerequisite to a validity

determination under § 101."); Multimedia Plus, 198 F. Supp. 3d at 267 ("Where the claims of the

patent are straightforward and [n]o components are opaque such that claim construction would

be necessary to flush out its contours[,] . . . claim construction is not necessary to reveal any

material legal issues and would not be a wise use of judicial resources.") (internal quotations

marks and citations omitted).

**B.**     **Analysis**

**1.**     **Step One of _Alice_ Analysis**

As to Alice's step one, Advanced Media contends that Claim 31 is "directed to

the abstract idea of collecting, manipulating, and displaying data of a baseball strike zone," and

"is written in purely functional language, identifying the 'what' (identify and display the strike zone) but not the 'how.'"  (Def. Br. (Dkt. No. 44) at 21-22)

The Federal Circuit has treated "collecting information," "analyzing information," and "presenting the results . . . of collecting and analyzing information, without more (such as identifying a particular tool for presentation), [a]s abstract . . . ."  Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1354 (Fed. Cir. 2016) (collecting cases).  The Federal Circuit has also held that "claims [that] are clearly focused on the combination of those abstract-idea processes, . . . and not any particular assertedly inventive technology for performing those functions," are "directed to an abstract idea."  Id.

Here, Claim 31 merely describes a method for determining three-dimensional volume, converting that volume to a two-dimensional image, and adding that image to a video in general terms, without identifying the "assertedly inventive technology for performing those functions."  Id.  The fact that Claim 31 refers to a baseball strike zone does not affect the step one analysis, because "[l]imiting the invention to a technological environment does not make an abstract concept any less abstract under step one."  Berkheimer v. HP Inc., 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal quotation marks and citations omitted).

Plaintiffs contend, however, that Claim 31 does address the "how," because it

> recites a particular way of determining an objectively accurate three-dimensional volume of the strike zone for a batter and displaying a graphical image of the exact boundaries of the strike zone on a video by:  (i) requiring an image of the batter ('530 Patent at 2:48-3:4); (ii) receiving indications of one or more positions on the batter in the image (id. at 2:35-41, 2:61-3:20); (iii) using the indicated positions to automatically calculate the height and three dimensional volume of the batter's strike zone (id. at 3:21-28); (iv) determining a first position in a video of a baseball game, corresponding to the batter's strike zone (id. at 5:1-11, Fig. 3); (v) converting the three dimensional volume of the strike zone to two-dimensional locations within the video using data in the video (id. at 4:23-48, 4:57-5:30, Fig. 3); and (vi) adding an image for the strike zone to every field of video that passes through the keyer (id. at 5:13-37, 5:59-7:11).

26

(Pltf. Opp. Br. (Dkt. No. 45) at 23 (emphasis in original))

Assuming arguendo that Claim 31 describes a "particular way of determining an objectively accurate three-dimensional volume of the strike zone for a batter and displaying a graphical image of the exact boundaries of the strike zone on a video" (see id.), the claim is still abstract. Each of the six steps set forth in Plaintiff's recounting of Claim 31 is still, at bottom, a presentation of "what" rather than "how."

Plaintiffs argue, however, that "Step One of the Alice test requires courts to examine the purpose of a challenged claim." (Pltf. Opp. Br. (Dkt. No. 45) at 24) The purpose here, they argue, is to "provid[e] a tangible result to the viewing audience of a baseball game – a graphical image of the exact boundaries of the strike zone specific to the current batter." (Id. at 24)

But this stated purpose is just a variation on "presenting data." Each step of Claim 31, even as restated by Plaintiffs, is plainly aimed at collecting, analyzing, or presenting data: "Requiring an image of the batter" is collecting data; "receiving indications of one or more positions on the batter" is collecting data; "using the indicated positions to automatically calculate the height and three dimensional volume" is analyzing data; "determining a first position in a video of a baseball game" is collecting and analyzing data; "converting the three dimensional volume of the strike zone to two-dimensional locations within the video using data in the video" is analyzing data; and "adding an image for the strike zone to every field of video" is presenting data.

Plaintiffs also cite McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1308, 1316 (Fed. Cir. 2016) and Diamond v. Diehr, 450 U.S. 175, 184 (1981), but neither case is analogous. According to Plaintiffs, Claim 31 sets forth "a specific process for automatically

27

calculating height and a three-dimensional volume," which is analogous to the patent-eligible process at issue in McRO, which involved "'a method for automatically animating lip synchronization and facial expression of three-dimensional characters.'"  (Pltf. Opp. Br. (Dkt. No. 45) at 26-27 (citing McRO, 837 F.3d at 1308, 1316)

In McRO, however, the court found that "the ordered combination of claimed steps, [which] us[e] unconventional rules that relate sub-sequences of phonemes, timings, and morph weight sets," is not abstract.  McRO, 837 F.3d at 1302-03.  Here, Claim 31 states that one particular step – calculating height and a three-dimensional volume – occurs "automatically," but Claim 31 provides no detail as to how the automatic calculation occurs.  In McRO, by contrast, the claim sets forth five detailed steps explaining exactly how the animation occurs automatically.  Id. at 1307-08.

Plaintiffs contend that Diamond v. Diehr likewise involves "a detailed step-by-step method" that was found to be not abstract (Pltf. Opp. Br. (Dkt. No. 45) at 27 (citing Diamond, 450 U.S. at 184), but Diamond does not support their argument.  In Diamond, the claim described steps "beginning with the loading of a mold with raw, uncured rubber and ending with the eventual opening of the press at the conclusion of the cure."  The Supreme Court notes that "[i]ndustrial processes such as this are the types which have historically been [patent-eligible]." Diamond, 450 U.S. at 184.  Indeed, Diamond involves a physical process that is inherently less abstract than the data analysis that is the subject of Claim 31.  Finally, Diamond is a pre-Alice decision, and the Court does not make a finding that the process is not abstract.  In sum, the claim in Diamond is not analogous to Claim 31.

Plaintiffs also argue that "the dependent claims confirm that Claim 31 is not directed to an abstract idea," noting that they "specify particular cameras and equipment as well

as additional claim elements further limiting the method limits of an invention."  (Pltf. Opp. Br. (Dkt. No. 45) at 25)  The Federal Circuit has held, however, that "[limitations] to a technological environment for which to apply the underlying abstract concept . . . do not make an abstract concept any less abstract under step one."  <u>Intellectual Ventures I LLC v. Capital One Fin. Corp.</u>, 850 F.3d 1332, 1340 (Fed. Cir. 2017)

The Court concludes that Claim 31 is directed to an abstract idea.

### 2.    Step Two of *Alice* Analysis

As to step two of the <u>Alice</u> analysis, Defendant argues that Claim 31 "contains no limitations that add an inventive step beyond this abstract idea," because "the limitations completely lack technical detail and contain only instructions to perform the abstract idea using generic steps untethered to any specific technology."  (Def. Br. (Dkt. No. 44) at 28)  Defendant also asserts that Claim 31 "does not provide a particular method for determining a three-dimensional space, does not require a particular technique for converting a three-dimensional space to a two-dimensional image, and never instructs on how to add the image to video."  (<u>Id.</u>) "Further, the claim does not even limit itself to any particular technology to carry out these tasks."  (<u>Id.</u>)

Under step two of the <u>Alice</u> analysis, the Court must consider whether the elements of a claim, both individually and "as an ordered combination," include an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  <u>Alice</u>, 573 U.S. at 217-18.  "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact."  <u>Berkheimer v. HP Inc.</u>, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

As to inventiveness, the Amended Complaint pleads that Claim 31 provides that the strike zone is to be "'inserted over live video.'"  (Am. Cmplt. (Dkt. No. 26) ¶ 89) "Conventional means for adding a strike zone to an image are comprised of simply drawing a rectangle based on a visual estimate of the actual strike zone."  (Id.)  Moreover, "[c]onventional solutions were not able to determine a location of a strike zone in the claimed manner because they did not receive an indication of one or more positions of the batter in an image of the first batter and use those positions to automatically calculate height and a three dimensional volume of the strike zone."  (Id. ¶ 87)  Plaintiffs' technology, by contrast, "us[es] the accurate height and three dimensional strike zone determined above and convert[s] this information into two dimensional locations within the video by using the data in the video."  (Id. ¶ 89)

Defendant takes issue with what it characterizes as Plaintiffs' "generic computer implementation of the abstract idea," arguing that it "is practiced in the exact order, and in the exact manner, that would be expected."  (Def. Br. (Dkt. No. 44) at 29)  But making the conclusory assertion that the implementation – with the benefit of hindsight – is "generic" is not sufficient to rebut Plaintiffs' claim of inventiveness, particularly given Plaintiffs' well-pleaded allegations that Claim 31 goes beyond "conventional solutions" in several key respects. Plaintiffs emphasize the importance of displaying the strike zone over live video – as opposed to a replay – and they have alleged that, unlike previous implementations, their process "use[s] the data in the video" in order to convert three-dimensional information into two-dimensional information.  These allegations and the plain language of Claim 31 are sufficient to create a "question of fact" under Berkheimer.  See Berkheimer, 881 F.3d at 1368.

Defendant's remaining arguments are not persuasive.  For example, Defendant points out that "certain steps are to be performed manually by human operators."  (Def. Br. (Dkt.

No. 44) at 28)  But there are other steps that are clearly not performed manually; the fact that one or more steps is not inventive is not dispositive.

Defendant cites Mortgage Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314 (Fed. Cir. 2016) for the proposition that "'[a]fter Alice, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible[.]'"  (Id. at 29 (quoting Mortgage Grader, 811 F.3d at 1325))  But in Mortgage Grader, the court found that "[n]othing in the asserted claims 'purport[s] to improve the functioning of the computer itself' or 'effect an improvement in any other technology or technical field.'" Mortgage Grader, 811 F.3d at 1325 (quoting Alice, 573 U.S. at 224).  Here, Plaintiffs claim a significant improvement over existing technology:  the ability to overlay the strike zone on live video.

Finally, Defendant criticizes Plaintiffs' "half-hearted attempt to suggest that claim construction is necessary, [which does] not identify a single term for which construction would affect the outcome . . . ."  (Def. Reply Br. (Dkt. No. 44) at 14)  But the parties have briefed a motion to dismiss, not whether claim construction is necessary.

Defendant's motion to dismiss Plaintiff's patent infringement claim will be denied.

## CONCLUSION

For the reasons stated above, Defendant's motion to compel arbitration and

motion to dismiss are denied.  The Clerk of Court is directed to terminate the motion (Dkt. No.

43).

Dated: New York, New York
       April 23, 2020                          SO ORDERED.

                                               _____
                                               Paul G. Gardephe
                                               United States District Judge